AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)        ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**4/5/2021**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JB _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT

04/05/21

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ jm _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

Zachary Joseph Horwitz,

Defendant

Case No.    2:21-mj-01631-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of December 14, 2018, in the county of Los Angeles, in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

John Verrastro, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        04/05/21

_____
*Judge's signature*

City and state:    Los Angeles, California            Hon. Maria A. Audero, U.S. Magistrate Judge
*Printed name and title*

AUSA: Alexander Schwab x1259/David Chao x0166

## **AFFIDAVIT**

I, John Verrastro, being duly sworn, declare and state as follows:

### I.  **INTRODUCTION**

1.   I am a Special Agent of the Federal Bureau of Investigation ("FBI") in the Los Angeles Field Office and have been so employed since 2004.  For approximately fifteen years, my primary responsibility has been investigating securities fraud, mail fraud, wire fraud, money laundering, and other fraud violations.  My experience includes interviewing witnesses, gathering documents, analyzing financial documents, conducting surveillance, and serving grand jury subpoenas.  I have also received training in investigating financial crimes, including securities fraud, bank fraud, wire fraud, and money laundering. Prior to becoming an FBI agent, I worked for ten years in financial services at a bank and an investment firm.  In the course of my FBI employment, I have participated in executing many search warrants of businesses and residences in connection with financial fraud offenses.  In investigating fraudulent schemes, I have become familiar with the types of records and documents that individuals and entities use to perpetrate their schemes, and have executed and participated in the execution of search warrants at homes and businesses of individuals involved in fraudulent schemes.

## II. <u>PURPOSE OF AFFIDAVIT</u>

2.   This affidavit is made in support of a complaint and arrest warrant for ZACHARY JOSEPH HORWITZ for a violation of wire fraud, in violation of 18 U.S.C. § 1343.  It is also made in support of an application for a warrant to search the premises located at 9615 Bolton Road, Los Angeles, California 90034 (the "SUBJECT PREMISES") for the evidence, contraband, fruits, and instrumentalities of securities fraud, mail fraud, wire fraud, aggravated identity theft, and money laundering, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10-b; and 18 U.S.C. §§ 1341, 1343, 1028A, 1956, and 1957 (the "Subject Offenses").

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, information obtained from various law enforcement personnel, other government agencies, and witnesses, and my review of records.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. <u>PREMISES TO BE SEARCHED</u>

4.   The SUBJECT PREMISES is located at 9615 Bolton Road, Los Angeles, California 90034.  The SUBJECT PREMISES is a white and tan colored two-story home with an attached two-car garage.

There is a support pillar on the front porch with the numbers
9615 shown vertically.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

5.    Since 2013, ZACHARY JOSEPH HORWITZ, who goes by the
screen name "Zach Avery," has operated a film distribution
company called 1inMM Capital LLC ("1inMM Capital").  Based in
Los Angeles, California, 1inMM Capital is purportedly engaged in
the business of buying and selling film distribution rights.  To
raise money to acquire film rights, HORWITZ solicited
investments through the issuance of promissory notes to
investors, particularly private investors.  To attract
investors, HORWITZ falsely represented that 1inMM Capital used
investor funds to acquire film distribution rights, which he
would then license to major online platforms such as Netflix or
HBO, thus enabling 1inMM Capital to provide investors lucrative
rates of return on the promissory notes, often in excess of 25
percent.  In reality, as HORWITZ knew, 1inMM Capital did not use
the investor funds for the stated purpose and did not have
licensing deals with these online platforms, but instead
diverted the funds for his personal benefit and to make payments
on earlier promissory notes in the style of a classic Ponzi
scheme.  To date, HORWITZ, through 1inMM Capital, is in default
to investors on a total outstanding principal of approximately
$227 million.

**A.   Background on Zachary HORWITZ, 1inMM Capital, and JJMT Capital**

6.     Based on my review of law enforcement databases and public source documents, I know that HORWITZ is an actor and self-described Hollywood entrepreneur who lives in Los Angeles. In 2013, he founded 1inMM Capital, a Los Angeles-based film distribution company that claimed to acquire and distribute English language feature films to the Latin American market through partnerships with online platforms like Netflix and HBO.

7.     California Secretary of State records show that HORWITZ is the sole manager of 1inMM Capital.  Records from City National Bank ("CNB") show that HORWITZ is also the sole signatory for a CNB checking account in the name of 1inMM Capital ending in -0290 (the "1inMM Capital account").

a.   I have reviewed a corporate "Statement of Information" for 1inMM Capital filed with the California Secretary of State on October 18, 2019.  The Statement of Information lists the SUBJECT PREMISES as the "Business Address" for 1inMM Capital.  That is the most recent record for 1inMM Capital available through the California Secretary of State's online "Business Search" database.

b.   I have reviewed CNB bank records showing that, no later than May 31, 2018, the address of record for the 1inMM Capital account was the SUBJECT PREMISES.  The SUBJECT PREMISES has remained the address of record through the most recent account records I have reviewed, which cover the period through February 26, 2021.

8.   Based on witness interviews, my review of declarations provided by investors with 1inMM Capital, as well as information obtained from other government agencies, I am aware of five main groups of private investors with HORWITZ through 1inMM Capital: JJMT Capital, LLC ("JJMT"); Movie Fund, LLC ("Movie Fund"); Fortune Film Fund One, LLC, Fortune Film Fund Two, LLC, and SAC Advisory Group, LLC (collectively, "SAC"); Vausse Films ("Vausse"); and Pure Health Enterprises, Inc. ("Pure Health").

9.   By far the largest source of investor funds was a private firm, JJMT.  I have interviewed J.A., a principal of JJMT.  Communications between HORWITZ and JJMT occurred via telephone, email, and text, as well as through meetings in person.

a.   HORWITZ began pitching to investors, including JJMT, an opportunity to provide funds to 1inMM Capital to purchase regional distribution rights to films, typically in the post-production stage of development, which 1inMM Capital would then license to online platforms such as HBO and Netflix for distribution in particular regions outside the United States, including Latin America.  HORWITZ explained to investors that, based on his business relationships, 1inMM Capital could reliably license the film distribution rights to the online platforms for sums greater than what he paid for the distribution rights, thereby providing a predictable profit opportunity each time 1inMM Capital acquired a film's distribution rights.

    i. HORWITZ's representations were also reduced to writing.  For example, attached as Exhibit 1 is a copy of a document titled "1inMM Capital Annual Report" provided by HORWITZ through 1inMM Capital to investors.  According to information relayed by counsel for JJMT, HORWITZ sent hard copies of this Annual Report to the principals of JJMT -- along with a bottle of Johnny Walker Blue Label scotch -- via U.S. mail in July 2015, and sent electronic versions to them by email in August 2015.  In the Annual Report, HORWITZ represented that in the past year, he had "acquired and successfully distributed 49 films through the 1inMM Capital banner without incurring a single loss in the process."  He reported that 1inMM Capital "continue[d] to source quality feature film projects, solidify our reputation and relationships with our current output deals and continuously search for additional profitable partnerships."  HORWITZ also claimed that "we have expanded our business model with HBO Entertainment and NETFLIX to not only service the thriving Latin American marketplace but now are distributing feature films to Australia and New Zealand as well."  "With this growth," he wrote, "we have the ability to safely and profitably distribute more than 25 additional films per year, creating ample opportunity for investment and substantial growth of our thriving feature film library."

    ii. To bolster the claims of 1inMM Capital's "film library," the Annual Report contains a one-page spread under the heading "Library Snapshot" featuring thumbnail size posters for 52 films.

iii. To bolster the claims of 1inMM Capital's ability to secure output deals for distribution in Latin America, the Annual Report contained a one-page spread under the heading "Our Strategic Partnerships" featuring the logos of HBO, Netflix, and Sony above the label "Distribution Partner," as well as the logos and names of several purported "Foreign Sales Partner[s]."

iv.  The Annual Report also contains several detailed representations concerning how the investments were secured.  Under the heading "Investment Focus," HORWITZ wrote, "our strategy has been and will always be a collateralized investment approach to ensure that solid returns and safe investments are the pillars that solidify our foundation."  He explained, "[t]he acquisition of each film that we acquire uses the asset acquired (Distribution Rights of the film) as collateral against any unexpected negative event that may occur. If, at any point, one of our current output deals (HBO / SONY / NETFLIX) would default on a payment owed to the company; the rights to distribute the film would immediately revert back to the distributor (1inMM Capital) and the distributor would place the film through a different output deal."  More specifically, HORWITZ elaborated that "in the event of one output platform defaulting on payment, 1inMM Capital has confirmation that this title will be acquired by a secondary deal and therefore making the investment whole."  In other words, "in the event that Netflix, HBO or Sony defaults on a payment, declares bankruptcy or displays contractual delinquency in any form, we simply sell

the film to one of the two remaining output platforms that already have agreed to license the rights of the film." Finally, HORWITZ claimed that "through our solid relationships, we receive confirmation from each of our outputs indicating their desire to acquire the rights to any title we purchase PRIOR to us releasing funds for the film so that in the event of any unexpected occurrence, we are able to recover our investment through an alternative company."

b.   Based on these representations, defendant HORWITZ solicited investments through the issuance of a series of promissory notes, which guaranteed a specified payment on a particular maturity date, typically 6 months or 12 months in the future.  Each promissory note corresponded to the purported purchase of the distribution rights to a specific film and was secured by an assignment of the distribution rights to that film.  Following this structure, 1inMM Capital and JJMT entered into approximately 500 such promissory notes through 2019 based on J.A.'s estimation.[1]

i.   For example, 1inMM Capital and JJMT entered into a promissory note dated September 27, 2019, signed by HORWITZ, pursuant to which 1inMM Capital borrowed $742,250 from JJMT and promised to repay $999,845 within six months, representing a calculated return of approximately 35 percent. The promissory note is purportedly secured by an assignment to JJMT of the distribution rights to the film "Bitter Harvest."

---

[1] J.A. recalled that one of the earliest promissory notes the JJMT principals entered with 1inMM Capital was dated October 6, 2014.

Account records for the 1inMM Capital account reflect an incoming wire payment of $742,250 on September 27, 2019.

        ii.  Similarly, 1inMM Capital and JJMT entered into a promissory note dated December 17, 2018, signed by HORWITZ, pursuant to which 1inMM Capital borrowed $1,425,500 from JJMT and promised to repay $1,998,825 within twelve months, representing a calculated return of approximately 40 percent. The promissory note is purportedly secured by an assignment to JJMT of the distribution rights to the film "Active Measures." Records for the 1inMM Capital account reflect an incoming wire payment of $1,425,500 on December 14, 2018, with "ACTIVE MEASURES FUNDING" listed on the wire item.[2]  The wire transfer was originated by JJMT, which is based in Chicago, Illinois.

        c.  To reassure the investors of 1inMM Capital's legitimacy and the likelihood of returns on their investments, HORWITZ would inform the investors both that 1inMM Capital had entered into agreements with film producers to license the distribution rights to specific films, and that online platforms had entered into agreements with 1inMM Capital to distribute the specific films.  To support these claims, HORWITZ provided copies of these purported licensing agreements and distribution agreements to investors.

        i.  For example, HORWITZ provided JJMT with a 12-page license agreement dated October 2, 2019, between Sierra/Affinity, as agent for Meyer Media Group, and 1inMM

---

[2] For purposes of the requested complaint, this interstate wiring is the selected execution of the scheme.

Capital, pursuant to which Meyer Media Group purportedly licensed to 1inMM Capital the exclusive rights to distribute the film "Bitter Harvest" in certain Latin American and African territories for a term of 15 years, in exchange for a license fee of $739,500.  The agreement bears handwritten signatures by HORWITZ for 1inMM Capital and purportedly by the "EVP International Sales" for Sierra/Affinity.

ii.  Additionally, HORWITZ provided JJMT with a 13-page distribution agreement dated September 11, 2019, between 1inMM Capital and HBO, pursuant to which 1inMM purportedly licensed to HBO the rights to distribute the film "Bitter Harvest" in Africa and Latin America for a term of three years, in exchange for an advance of $999,845, payable and due in six months.  The agreement bears handwritten signatures by HORWITZ for 1inMM Capital and purportedly by the "President of Operations" for HBO Latin America Holdings.

iii. Similarly, HORWITZ provided JJMT with a 12-page license agreement dated December 17, 2018, between Sierra/Affinity, as agent for Shooting Films, and 1inMM Capital, pursuant to which Shooting Films purportedly licensed to 1inMM Capital the exclusive rights to distribute the film "Active Measures" in certain Latin American and African territories for a term of 15 years, in exchange for a license fee of $1,425,500. The agreement bears handwritten signatures by HORWITZ for 1inMM Capital and purportedly by the "EVP International Sales" for Sierra/Affinity.

iv.   Additionally, HORWITZ provided JJMT with a 20-page distribution agreement dated December 21, 2018, between 1inMM Capital and Netflix, pursuant to which 1inMM purportedly licensed to Netflix the rights to distribute the films "Active Measures" and "Divide and Conquer" in certain Latin American and Caribbean territories for a term of three years, in exchange for a fee of $4.2 million for both titles, payable and due in twelve months.  The agreement bears handwritten signatures by HORWITZ for 1inMM Capital and purportedly by Funa Maduka, the "VP, Content Acquisition" for Netflix.

d.   Prior to the end of 2019, 1inMM Capital generally honored its promissory notes with investors, including JJMT. But since December 2019, 1inMM Capital has continually defaulted on its outstanding promissory notes with investors.  With respect to JJMT alone, 1inMM Capital appears to have defaulted on over 160 promissory notes relating to films that were supposed to be distributed by the online platforms.  As a result, 1inMM Capital has defaulted in more than $160 million in principal to JJMT alone and owes approximately $59 million more in returns per the terms of the defaulted promissory notes.

e.   Based on my review of declarations provided by investors and information provided by other government agencies, I am aware that HORWITZ, through 1inMM Capital, made substantially the same misrepresentations described above to the four other major investor groups, namely, by falsely representing that he would use borrowed funds to acquire film rights that would be licensed to online platforms such as

Netflix and HBO.  And just like with JJMT, at certain points in time in 2019, 1inMM Capital began serially defaulting on its promissory notes with these other investors.  Specifically, 1inMM Capital has defaulted on approximately $29.7 million in principal with SAC, approximately $20 million in principal with Movie Fund, approximately $10 million in principal with Pure Health, and approximately $8 million with Vausse.  In sum, HORWITZ, through 1inMM Capital, is in default to investors on a total outstanding principal of approximately $227 million.

     **B.    1inMM Capital Defaults and HORWITZ Dissembles**

    10.  Beginning in December 2019, 1inMM Capital and HORWITZ began defaulting on every promissory note with JJMT with a maturity date on or after December 11, 2019.

    11.  To prolong the scheme and maintain the illusion that 1inMM Capital was a legitimate business in the wake of these mounting defaults, HORWITZ falsely represented to JJMT that the online platforms had refused to pay on time for the distribution rights as obligated, and provided excuses that were purportedly given by Netflix and HBO.  To support these claims, HORWITZ repeatedly sent JJMT emails in which he forwarded purported email correspondence with employees of Netflix and HBO, respectively, discussing the underlying licensing agreements.

    12.  With respect to Netflix, HORWITZ fabricated the excuse that Netflix was performing an audit on all the licensed films to ensure clear title and would pay the license fees upon completion of the audit.

a.   On February 13, 2020, HORWITZ, using the email account "zach@1inmm.com," sent an email to the principals of JJMT, all of whom live in the greater Chicago area, in which he forwarded purported email correspondence from the same day with J.G., Senior Counsel at Netflix.  In the email, J.G., using a "@netflix.com" domain email address, purportedly wrote that Netflix was performing an audit to confirm "that all materials are in place, rights are cleared, paperwork is in order, etc." for all content that associated with 1inMM Capital.

b.   In the months that followed, HORWITZ sent numerous emails to JJMT forwarding purported email correspondence from J.G. informing HORWITZ of the progress of the audit.

13.  With respect to HBO, HORWITZ fabricated the excuse that HBO Latin America was entering a restructuring that would entail modifications to its existing business practices.

a.   On February 21, 2020, HORWITZ, using the email account "zach@1inMM.com," sent an email to the principals of JJMT, in which he forwarded purported email correspondence from the same day from L.V., using a "@hbo.com" domain email address and writing on behalf of the "HBO Latin America Team."  In the email, L.V. purportedly wrote that HBO Latin America was in the process of bringing in HBO Brasil Partners, which would be accompanied by "modifications to our previous business practices," including "payment cycles, exploitation windows, profit participation cycles, audit reviews, providing participation statements, renegotiating currently licensed

13

titles to increase licensing period, adding licensing territories and more."

    b.    On March 5, 2020, HORWITZ, using the email account "zach@1inmm.com," sent an email to the principals of JJMT, which forwarded purported email correspondence on the same day from L.V., again on behalf of the "HBO Latin America Team." In the email, L.V. purportedly expressed his appreciation to HORWITZ and another individual for meeting in person to discuss their relationship.  L.V. also purportedly included minutes of their meeting on March 2 and 3, 2020, at the "HBOLA Office in Coral Gables and W Miami Hotel," which covered the names of attendees, including HORWITZ, and discussion topics, including "[d]iscussion of Zach's concern regarding 3rd party investor pressure."

    c.    In the months that followed, HORWITZ sent numerous emails to JJMT in which he forwarded purported email correspondence from L.V. that supposedly reflected the status of discussions regarding the business relationship between HBO and 1inMM Capital.

    14.    As of today's date, however, 1inMM Capital has not satisfied any of its promissory notes with JJMT which have become due after December 11, 2019.  Each of these notes was tied to a film to which 1inMM Capital purportedly held distribution rights that it had licensed to HBO or Netflix.

    C.    **HORWITZ's Misuse of Investor Funds**

    15.    Based on my review of bank records, I believe much of the investor money sent to the 1inMM Capital account for the

purchase of film licensing rights in Latin America was diverted to other purposes, such as payment of personal expenses or payment of returns on earlier investments in a manner consistent with a Ponzi scheme.

### 1.   Purchase of the SUBJECT PREMISES

16.   One personal expense to which it appears investor funds were improperly diverted was the purchase of the SUBJECT PREMISES itself.  I have reviewed records for a CNB account for an account in HORWITZ's name ending -5270 (the "HORWITZ personal account").  The most recent records, which continue through February 2021, list the SUBJECT PREMISES as the address on record for the HORWITZ personal account.  According to the records, the HORWITZ personal account had a balance of $311,130.70 as of February 28, 2018, but by March 28, 2018, HORWITZ made a wire payment of $5,556,401.13 to complete the purchase of the SUBJECT PREMISES.[3]  The credits to the HORWITZ personal account between February 28 and March 28 all come from three sources: JJMT, the 1inMM Capital Account, and a second CNB account HORWITZ maintained for 1inMM Capital ending in -2944 for which he was the sole signer ("1inMM Capital account 2").

a.   On March 27, 2018, the HORWITZ personal account received a wire transfer directly from JJMT for $2,225,564.

b.   On March 28, 2018, the 1inMM Capital account made two transfers to the HORWITZ personal account: one for $800,000 and one for $900,000.  These payments also appear mostly to

---

[3] HORWITZ wired a payment of $171,375 from the HORWITZ personal account to the same escrow company on January 29, 2018, in what appears to have been an earnest money payment.

comprise funds from investors in 1inMMC Capital, particularly
JJMT.  As of March 15, 2018, for example, the 1inMM Capital
account had a balance of $1,910,149.30.  From that date through
March 28, 2018, the 1inMM Capital account received the following
wire payments: March 16: $720,375.00 from JJMT; March 20:
$694,850.00 from "Global Hospitality Concepts"; March 22:
$612,620.00 from JJMT; March 22: $650,175.00 from JJMT; March
22: $675,550.00 from JJMT; March 22: $690,800.00 from JJMT;
March 22: $1,406,250.00 from JJMT; March 22: $1,428,700.00 from
JJMT; March 23: $180,000.00 from Creative Artists Agency; March
27: $1,380,900.00 from JJMT; March 27: $1,405,000.00 from JJMT;
March 28: $622,100.00 from JJMT; March 28: $685,250.00 from
JJMT; and March 28: $725,400.00 from JJMT.

      c.   Between March 14 and March 28, 2018, 1inMM
Capital account 2 transferred a total of $2,675,000 to the
HORWITZ personal account across four transfers.  As of February
12, 2018, 1inMM Capital account 2 had an ending balance of
$735,583.  That same day and the next, 1inMM Capital account 2
received three wire transfers from investors: $685,350 from
Fortune Film Fund Two LLC, $705,700 from Fortune Film Fund Two
LLC, and $620,000 from SAC Advisory Group LLC.  On March 20,
2018, 1inMM Capital account 2 received another wire payment for
$620,185 from investor Fortune Film Fund Two LLC.  These four
wire transfers were the only credits to 1inMM Capital account 2
between February 12, 2018, and March 28, 2018.

     17.  Because HORWITZ transferred funds from his bank
accounts to pay off substantial credit card balances, it is

difficult to glean a full picture of HORWITZ's lifestyle from these financial records alone.  Just a week before paying over $5.5 million to complete the purchase of the SUBJECT PREMISES, for example, he paid $70,328.05 from the HORWITZ personal account to American Express.  The next month, he made another payment to American Express of $57,351.25 on April 20, and on May 3, he made a payment of $164,241.06.

18.  I have reviewed photographs of the SUBJECT PREMISES from its Zillow listing, and these photographs are consistent with an expensive personal lifestyle.  The house includes an extensive home theater, home gym, and wine "cellar."  Shots of the interior show artwork and what appears to be a grand piano. In March 2018, the same month HORWITZ purchased the SUBJECT PREMISES, the HORWITZ personal account wired two payments of $70,000 to Lonni Paul Design for "RETAINER/COUCH/SIDETABLE." Some of the photographs that I reviewed from the Zillow listing are attached as Exhibit 2 to this affidavit.

2.  <u>Ponzi Scheme Payments</u>

19.  In addition to the misuse of investor funds on personal expenses, I have also identified movements of funds consistent with a Ponzi scheme.  Based on my review of bank records for the 1inMM Capital account, it appears that incoming investor money was used to repay investors for previous investments.  In some instances, the investors were repaid with their own money.  In addition, funds were sent to the HORWITZ personal account.

17

20.   Focusing on December 2018 and January 2019, the ending balance in account the 1inMM Capital account as of November 30, 2018, was $4,332,730.51.  On December 4, 2018, there were two wire transfers to JJMT.  One transfer was for $1,795,585 with "NETFLIX WISH UPON" noted in the wire records under the caption "ORIG TO BNF INFO," and a second wire transfer was for $1,792,525 with "NETFLIX JUST LIKE OUR PARENTS" noted under the caption "ORIG TO BNF INFO."

a.   Based on my interview of J.A., as well as my training and experience reviewing wire transfer payments, I believe the ORIG to BNF INFO on these wires indicates that they were repayments of notes with JJMT for the movies "Wish Upon" and "Just Like Our Parents."  Though the wires indicate the wire transfers related to Netflix, consistent with HORWITZ's representation that he sold film rights to Netflix, I have seen no indication in the bank records that I have reviewed from this time period that 1inMM Capital or HORWITZ received any payments from Netflix consistent with the licensing of film rights, which is consistent with the declaration of Melinda LeMoine, which stated that Netflix had no business with 1inMM Capital.

b.   Between December 4, 2018, and December 7, 2018, there were two wire transfers from the 1inMM Capital account totaling $161,000, one check paid in the amount $9,500, and a transfer to the HORWITZ personal account for $150,000 -- a total

of $320,500 in outgoing payments, which collectively brought the ending balance on December 7, 2018, to $424,120.51.[4]

      c.   Between December 14, 2018, and December 31, 2018, the 1inMM Capital account received nineteen wire transfers totaling $16,380,450.  Thirteen wire transfers were from JJMT for a total of $12,763,900, though this latter amount includes a $55,000 figure that may have been transferred as a Christmas present on December 24.

      d.   During the same time period, one check for $11,000 made payable to "Great Buy Tickets" posted to the 1inMM Capital account, and two transfers were made from 1inMM Capital account to the HORWITZ personal account totaling $500,000 (along with one additional $30,000 wire transfer to a CNB account for 1inMM Productions ending -1130 that listed the SUBJECT PREMISES as the address on file).  In addition, thirteen wire transfers were paid to investors, including JJMT, totaling $14,830,820.00. The ending balance for the 1inMM Capital account on December 31, 2018, was $1,432,750.51.  To summarize the 1inMM Capital account for December 2018:

| | |
|---|---|
| Ending Balance 11/30/2018 | $4,332,730.51 |
| Total Wires In | $16,380,450.00 |
| Total Wires Out Investors | $18,418,930.00 |
| Other Wires Out | $161,000.00 |
| Transfers to HORWITZ accounts | $680,000.00 |

---

[4] There was also a December 7, 2018, wire transfer of $150,000 to Jellyfish Pictures Ltd listing "SHOOKUM – INVOICE" on the wire records.  At this point, I have not yet verified the basis for this payment.

Checks Paid                    $20,500.00

Ending Balance 12/31/2018      $1,432,750.51

21.  Based on my training and experience, the figures above
are consistent with a Ponzi scheme rather than a legitimate
business along the lines of what HORWITZ described to his
investors.  The bank records do not show outgoing payments to
sales agents or film production companies consistent with the
acquisition of distribution rights, nor do they show incoming
payments from the online platforms to which HORWITZ claimed to
be licensing the film rights.  Rather, it shows incoming funds
to investors, outgoing funds to investors, with transfers to
other accounts HORWITZ controls along the way.

### D.  HORWITZ's Fraud Exposed

22.  In reality, neither HORWITZ nor 1inMM Capital ever
engaged in email correspondence with Netflix or HBO, nor did
HORWITZ or 1inMM Capital ever have any business relationship
with Netflix or HBO at all.  The email exchanges and licensing
agreements were fake.

23.  I have reviewed signed declarations from Melinda
LeMoine, the Director of Content Litigation at Netflix, and
Patrick Younan, Senior Litigation Administrator at Warner Media,
which owns HBO.

a.  According to Ms. LeMoine, Netflix has no business
relationship with HORWITZ or 1inMM Capital.  In fact, on
February 12, 2021, Ms. LeMoine sent a cease-and-desist letter to
HORWITZ both via his LinkedIn account and through his attorney.
The letter stated that Netflix learned HORWITZ and his company

1inMM Capital had used forged documents to represent to third parties that 1inMM Capital had licensing agreements with Netflix, but that, in fact, Netflix had no such agreements with 1inMM Capital or HORWITZ.  The letter further stated that HORWITZ has used fabricated emails purportedly exchanged with a Netflix employee to represent to others that he anticipates receiving funds from Netflix, and that those emails are also fraudulent.  The letter demands that HORWITZ stop making misrepresentations regarding his agreements with Netflix.

b.   According to Mr. Younan, Warner Media and its subsidiary HBO also have no business relationship with either HORWITZ or 1inMM Capital.  Mr. Younan verified that HBO had never licensed various film projects that HORWITZ had claimed to have licensed to HBO in his communications with investors.  In the case of some films, Mr. Younan confirmed that HBO had licensed the distribution rights, but that it had done so from companies like Lionsgate or Sony that had no affiliation with HORWITZ or 1inMM Capital.

24.  Notwithstanding these facts, HORWITZ continues to communicate with victims, providing excuses as to why they have yet to be repaid.

a.   For example, on March 12, 2021, HORWITZ, using the email account "zach@1inmm.com," sent an email to the principals of JJMT, positing that there has been much discussion with his lawyer regarding a settlement with HBO that would enable 1inMM Capital, and thus JJMT, to be paid without the need for litigation.  In the same email, HORWITZ also wrote that

"Netflix is a real problem at the moment," that he had been
"complying with every single thing that is being asked of me and
doing absolutely everything I can to assist, facilitate and
explain whatever is needed," and that he "will let [JJMT] know
further information and progress as soon as I have that
information and am able to share."

25.   Not only are the distribution agreements with HBO and
Netflix fabrications, it appears from my investigation that the
license agreements through which 1inMM Capital purportedly
acquired distribution rights were also fraudulent.  On April 2,
2021, I spoke on the phone with Kendra Dousette, an attorney for
Sierra/Affinity, a sales agent listed on numerous license
agreements HORWITZ purportedly entered on behalf of 1inMM
Capital.  Ms. Dousette explained that she has worked for
Sierra/Affinity since 2015 and is generally familiar with the
businesses that license Sierra/Affinity's library of films given
her involvement in reviewing license agreements.  She had never
heard of HORWITZ or 1inMM Capital.  When asked about 1inMM
Capital's purported license agreement with Sierra/Affinity for
the distribution rights to the film "Active Measures," she noted
that Sierra/Affinity has no record of that film and that real
license agreements Sierra/Affinity entered would be signed by
the chief operating officer or president -- not an "EVP"
(executive vice president), as stated on the purported
agreement.

E.    **HORWITZ and the SUBJECT PREMISES**

26.   There is considerable evidence to show HORWITZ resides at the SUBJECT PREMISES and that it contains evidence, fruits, and instrumentalities of the Subject Offenses.  The SUBJECT PREMISES is listed as the "Business Address" for 1inMM Capital and is the address on file for the 1inMM Capital account.

27.   The SUBJECT PREMISES is currently listed for sale on the website Zillow, and according to Zillow's website, has been listed since January 21, 2021.  On April 1, 2021, however, I was told by another FBI Agent who had been told by a real estate agent for the property that the SUBJECT PREMISES is currently owner occupied, in escrow, and undergoing inspection.  Because I know, from my training and experience, that it is common for individuals who have recently moved to set up mail forwarding with the U.S. Postal Service, I also communicated with a United States Postal Inspector.  The Postal Inspector determined there was no record of a forwarding address for the SUBJECT PREMISES as of March 31, 2021.

28.   This property is currently titled to Leslie S. Klinger in his capacity as trustee of the MJLZ Trust.  I have reviewed CNB account documents for an account ending -0501 for the MJLZ Trust.  HORWITZ is listed as the grantor.  Beginning in February 28, 2020, and continuing through the most recent available statement for this account dated February 26, 2021, the bank statements are addressed to MJLZ Trust, by Zachary Horwitz, Grantor and lists the SUBJECT PREMISES as the address.

29.  On April 1, 2021, I obtained a search warrant for location information for a Verizon telephone number for which HORWITZ is the subscriber at the SUBJECT PREMISES.  Location information show that HORWITZ was in the area of the SUBJECT PREMISES as recently as April 5, 2021.

30.  Based on my training and experience, and information from other experienced investigators of fraud offenses, I also know the following:

a.   Individuals involved in fraud schemes often use the proceeds of the fraud to purchase expensive items, or store the proceeds in the form of cash to make it more difficult to trace.  In fact, in reviewing the photographs from the online Zillow listing for the SUBJECT PREMISES, I saw numerous examples of what appear to be expensive items, including artwork, racks of wine bottles in what appears to be a wine cellar, and a fully equipped home gym.

b.   Typically, individuals involved in fraud schemes maintain evidence where it is close at hand and safe, such as in their residences, vehicles, and digital devices, which are also commonly stored in their residences and vehicles.  Indeed, in this case, HORWITZ appears to have made substantial use of digital devices to communicate in furtherance of the scheme by email and text message with his victims.  I know that individuals who commit crimes with the aid of electronic devices do not readily discard them, as computers, tablets, and cell phones are expensive items that are typically used for years before being upgraded or discarded.  Digital devices can be used

to communicate between co-conspirators and may contain information relating to the crime under investigation.  And, even when those who use digital devices to commit fraud do upgrade them, they often transfer data across devices, such as contact lists, email and text communications, and documentary records.

        c.   Individuals involved in fraud frequently keep the most damaging evidence and/or proceeds of the scheme at their residences and in their vehicles to help conceal the fraud from third parties, such as associates who may have access to such documents at a workplace.  Proceeds such as cash and gifts are easier to conceal at the fraudster's residence rather than in plain view of coworkers.

        d.   More sophisticated or cagey criminals may rent public storage units, safe deposit boxes, or other third-party space to further distance themselves from incriminating evidence or to hide their illicit profits from law enforcement or civil litigants. Such individuals typically maintain items relating to those third-party locations at their homes, such as keys, addresses, and leasing documents.

   31.  The requested search warrant seeks not only to seize evidence of crimes but also the "fruits of crime" and "property designed for use, intended for use, or used in committing a crime." Fed. R. Crim. P. 41(c).  Even long after a crime has been completed, the illicit proceeds of a crime often still exist, frequently secreted in forms or locations difficult to detect by law enforcement.  For that reason, there is probable

cause to seize evidence pertaining to HORWITZ's current assets, such as his ownership of the SUBJECT PREMISES, and whether it was purchased using funds derived from his investment fraud scheme.

## V.  REQUEST FOR SEALING

32.  I also request that the Court order that the requested complaint and search warrant be sealed.  The fact that HORWITZ has taken steps to sell the SUBJECT PREMISES and not all the proceeds of his fraud scheme have been traced mean that he is a flight risk, since he has both the resources to flee and likely has already taken some steps to find an alternate residence once the sale of the SUBJECT PREMISES is complete.  Additionally, the criminal investigation is not yet public, and premature disclosure of the warrants could cause HORWITZ to destroy or conceal evidence or assets constituting the fruits of his crimes.

## VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[5]

33.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

27

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   34.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

        b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

35.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HORWITZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of HORWITZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.  In depressing HORWITZ's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them

36.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

37.  For all the reasons described above, there is probable cause to believe that HORWITZ has committed wire fraud and that evidence of violations of the Subject Offenses, as described above and in Attachment B of this affidavit, will be found in a

//

//

search of the SUBJECT PREMISES, as further described above and
in Attachment A of this affidavit.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _5th_ day of
April, 2021.

_____   MAA
UNITED STATES MAGISTRATE JUDGE

EXHIBIT 1

# 1INMM

# CAPITAL

# ANNUAL
# REPORT

**2015**

# CHEERS TO OUR INVESTORS

**Thank you for your investment and trust in 1inMM Capital over the past year.** Our managing partners have worked tirelessly to provide a landscape that balances the protection of your investment with the proper amount of risk to garnish the profits that you have grown accustomed to obtaining. We could not be more pleased with our progress and we look extremely optimistically into our future.

Over the past year, we have managed our business model with the solid foundation that it was built on. We continue to source quality feature film projects, solidify our reputation and relationships with our current output deals and continuously search for additional profitable partnerships. We are ecstatic to report that over the past year, we have acquired and successfully distributed 49 films through the 1inMM Capital banner without incurring a single loss in the process. But this is only the beginning...

As we look into the future, 1inMM Capital's road ahead is extremely bright. As many of you are aware, we have expanded our business model with HBO Entertainment and NETFLIX to not only service the thriving Latin American marketplace but now are distributing feature films to Australia and New Zealand as well. With this growth, we have the ability to safely and profitably distribute more than 25 additional films per year, creating ample opportunity for investment and substantial growth of our thriving feature film library.

In the following pages, you will see the high level details of our investment overview. If you have any questions in regards to your investment/s or would like additional information in regards to the process, you know that we are always available.

Cheers!
**1inMM Capital Team**



# OUR MANAGING PARTNERS

### ZACH HORWITZ
*PRINCIPAL*

Zach is responsible for the companies overall strategy, capital transactions, operations, investor relations and content acquisitions. With ample experience working with 1inMM Productions, 1inMM Capital's parent company, Zach brings a wealth of knowledge, reputation and experience when growing 1inMM Capital to a prominent force in the foreign distribution landscape. Zach's main focus is providing investors an unparalleled financial business model in which he highlights gaps in an already profitable marketplace and takes advantage of these niche markets in order to garner returns for investors. Zach is a serial entrepreneur, founding and successfully managing or exiting four companies since his graduation from Indiana University in 2009.

### JULIO HALLIVIS
*PRINCIPAL*

Julio is responsible for bookkeeping, content acquisition, foreign sales agent relations and head of our Latin America distribution arm. Julio has an unprecedented knowledge of film production that allows him to have the ability of spotting projects at an early stage with the potential to become extremely profitable prior to being shopped at a film market. With these tools, Julio works closely with foreign sales agents to pinpoint projects for acquisition prior to them going on the market and eliminating the chance of a higher acquisition cost. Additionally, Julio has strong roots within the Latin American film landscape that allows 1inMM Capital to get inside access into an extremely difficult territory to capitalize. Julio is a credited commercial and film producer working with brands such as Porsche, Audi and Volkswagen prior to getting into film distribution.

# OUR MANAGING PARTNERS

## GUSTAVO MONTAUDON
*PRINCIPAL*

Gustavo is responsible for output deal relations with Netflix, Sony and HBO. Gustavo is a veteran in the business of distribution and acquisitions for Latin America. With over three decades of experience, his knowledge of the industry is unsurpassable. Gustavo founded Alebrije Entertainment, a leading programming distribution company for high quality products for television. This venture allowed him to negotiate multiple successful output deals with prominent companies such as Netflix, Sony Worldwide and HBO in Latin America, in addition to distributing Mexican films in the United States Hispanic video market. Prior to forming Alebrije Entertainment, Gustavo was Vice President of TV Distribution in Latin America for 20th Century Fox for 28 years, where he oversaw all sales of TV and Theatrical product in Latin America, including Video On Demand, Pay---Per---View, Free TV, Basic Cable, Internet and Syndication. Gustavo was credited for creating synergies between Fox divisions in Mexico and Latin America to launch Theatrical movies and DVD releases of movies, sequels, TV series and the licensing of products.



# OUR STRATEGIC PARTNERSHIPS



PARENT COMPANY



LEADING LATIN AMERICA
DISTRIBUTION COMPANY



FOREIGN SALES PARTNER



DISTRIBUTION PARTNER



FOREIGN SALES PARTNER



FOREIGN SALES PARTNER



FOREIGN SALES PARTNER



ENTERTAINMENT
ATTORNEY



DISTRIBUTION PARTNER



DISTRIBUTION PARTNER

PRIMARY BANKING
INSTITUTION

# OUR INVESTMENT FOCUS

**We believe that the safety of our investor's funds should always be our first priority.** Due to this notion, our strategy has been and will always be a collateralized investment approach to ensure that solid returns and safe investments are the pillars that solidify our foundation. The acquisition of each film that we acquire uses the asset acquired (Distribution Rights of the film) as collateral against any unexpected negative event that may occur. If, at any point, one of our current output deals (HBO / SONY / NETFLIX) would default on a payment owed to the company; the rights to distribute the film would immediately revert back to the distributor (1inMM Capital) and the distributor would place the film through a different output deal. Through our solid relationships, we receive confirmation from each of our outputs indicating their desire to acquire the rights to any title we purchase PRIOR to us releasing funds for the film so that in the event of any unexpected occurrence, we are able to recover our investment through an alternative company.

*\*Due to this fact, in the event of one output platform defaulting on payment, 1inMM Capital has confirmation that this title will be acquired by a secondary deal and therefore making the investment whole. Simply stated, in the event that Netflix, HBO or SONY defaults on a payment, declares bankruptcy or displays contractual delinquency in any form, we simply sell the film to one of the two remaining output platforms that already have agreed to license the rights of the film.*

# LIBRARY
# SNAPSHOT



EXHIBIT 2





