TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
DAVID H. CHAO (Cal. Bar No. 273953)
Assistant United States Attorneys
Major Frauds Section
        1100 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-1259/4586
        Facsimile: (213) 894-0141
        E-mail:   alexander.schwab@usdoj.gov
                  david.chao@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT ZACHARY JOSEPH HORWITZ; DECLARATION OF PATRICIA HASSON-OWENS |
|---|---|
| Plaintiff, | |
| v. | Hearing Date: 02-14-2022 |
| ZACHARY JOSEPH HORWITZ, | Hearing Time: 3:00 p.m. |
| Defendant. | Location:    Courtroom of the Hon. Mark C. Scarsi |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Alexander B. Schwab and David H. Chao, hereby files its Sentencing Position for defendant Zachary Joseph Horwitz.

//

//

//

This Sentencing Position is based upon the attached memorandum of points and authorities, the declaration of Patricia Hasson-Owens ("Hasson-Owens Decl."), the files and records in this case, including the presentence report ("PSR") and victim impact statements and interview reports, and such further evidence and argument as the Court may permit.

Dated: January 31, 2022          Respectfully submitted,

                                 TRACY L. WILKISON
                                 United States Attorney

                                 SCOTT M. GARRINGER
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                 _____/s/_____
                                 ALEXANDER B. SCHWAB
                                 DAVID H. CHAO
                                 Assistant United States Attorneys

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                 PAGE

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION....................................................1

II.   OFFENSE CONDUCT.................................................2

III.  GUIDELINES CALCULATION.........................................5

      A.    Substantial Financial Hardship to 25 or More Victims......6

      B.    Restitution...............................................10

IV.   THE GOVERNMENT'S SENTENCING RECOMMENDATION.....................14

      A.    The Nature and Circumstances of the Offense, the
            Seriousness of the Offense, and the Need to Provide
            Just Punishment All Support a 240-Month Sentence........14

      B.    Guideline Sentence of 240 Months Is Necessary to
            Afford Adequate Deterrence..............................17

      C.    Defendant's Personal Background Provides No Basis for
            a Downward Departure or Variance........................20

V.    CONCLUSION.....................................................21

i

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                        <u>PAGE</u>

**Federal Cases**

<u>United States v. Alfonso</u>,
    479 F.3d 570 (8th Cir. 2007) ................................. 12

<u>United States v. Carpoff</u>, No. 20-CR-17,
    ECF 53 (E.D. Cal.) ......................................... 19

<u>United States v. Davis</u>, No. 18-CR-25,
    ECF 164 (N.D. Ill.) ........................................ 19

<u>United States v. George</u>,
    949 F.3d 1181 (9th Cir. 2020) ............................. 9-10

<u>United States v. Houchins</u>, No. 20-CR-245,
    ECF 59 (E.D.N.C.) .......................................... 19

<u>United States v. Hsu</u>,
    669 F.3d 112 (2d Cir. 2012) ............................ 12, 13

<u>United States v. Koerber</u>, No. 17-CR-37,
    ECF 638 (D. Utah) .......................................... 19

<u>United States v. Martin</u>,
    455 F.3d 1227 (11th Cir. 2006) ............................. 19

<u>United States v. Rangel</u>,
    697 F.3d 795 (9th Cir. 2012) ............................... 15

<u>United States v. Santillo, Jr.</u>, No. 19-CR-6135,
    ECF 58 (W.D.N.Y.) .......................................... 19

<u>United States v. Setser</u>,
    568 F.3d 482 (5th Cir. 2009) ............................... 13

<u>United States v. Slade</u>, No. 13-CR-460,
    ECF 55 (D. Ariz.) .......................................... 19

<u>United States v. Stewart</u>, No. 14-CR-14,
    ECF 241 (C.D. Cal.) ........................................ 19

**Federal Statutes**

18 U.S.C. § 3553 .............................................. 14

18 U.S.C. § 3663A ......................................... 10, 11

**United States Sentencing Guidelines**

USSG § 2B1.1 .............................................. passim

USSG § 3E1.1 .................................................. 5

ii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                        PAGE

USSG § 5H1.12 ...................................................  20

**Other Authorities**

Bibas, Stephanos. <u>White-Collar Plea Bargaining and Sentencing After</u>
<u>Booker</u>, 47 Wm. & Mary L. Rev. 721 (2005) .......................  19

S. Rep. No. 98-255, at 76 (1983) ...............................  18

USSG Suppl. to Appendix C, amend. 617 at p. 185 (Nov. 1, 2001) ...  12

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Defendant Zachary Horwitz portrayed himself as a Hollywood success story.  He branded himself as an industry player, who, through his company, 1inMM Capital, LLC, leveraged his relationships with online streaming platforms like HBO and Netflix to sell them foreign film distribution rights at a steady premium.  First enlisting friends and their families, defendant steadily expanded 1inMM Capital, raising over $650 million from investors.  He lived the lifestyle: the posh Beverlywood home, the Vegas junkets, the trips by private jet.  He even performed in some minor film roles under the stage name "Zach Avery."  But, as his victims came to learn, defendant was not a successful businessman or Hollywood insider.  He just played one in real life.

Some crimes involve financial losses of such staggering magnitude that only a significant sentence is sufficient to deter imitators.  Other frauds, while maybe not so lucrative, are so heartless and prove so ruinous to their victims that only a substantial term of imprisonment can properly account for the seriousness of the crime.  This case falls in both categories.  Defendant ran the largest known Ponzi scheme in the history of this District.  He burned through a fortune, living a life of extravagance while sticking his victims -- including some who once believed him to be their friend -- with a $230 million bill that has left many of them financially broken and personally devastated.

The destruction defendant wrought cannot be overstated.  As letters from defendant's victims attest, defendant's crimes were cruel, consistent, and calculated.  The government therefore requests

1    that the Court impose a guideline sentence of 240 months'

2    imprisonment, three years of supervised release, and a $100 special

3    assessment, and a restitution order of $230,361,884.

4    **II.  OFFENSE CONDUCT[1]**

5         Defendant designed and carried out a massive Ponzi scheme that

6    impacted hundreds of victims who invested funds directly or

7    indirectly with defendant's purported film company, 1inMM Capital.

8    Year after year, for more than six years, defendant raised millions

9    of dollars from investors, many of whom were personal friends, based

10   on false claims that their money would be used to acquire film

11   licensing rights.  Defendant's actions caused $230 million in actual

12   losses to investors and immeasurable pain in their lives.

13        Defendant's scheme began in 2014 and lasted until he was

14   arrested on April 6, 2021.  (PSR ¶ 17, at 5).  During that time, he

15   solicited investors to buy promissory notes issued by 1inMM Capital

16   based on a series of materially false statements.  At the core,

17   defendant falsely claimed that 1inMM Capital would use investor funds

18   to buy rights to films, and then profitably license those rights to

19   streaming platforms such as HBO and Netflix for distribution abroad.

20   (Id. ¶¶ 18-19, at 5-6).

21        To carry out the fraud, defendant entered into more than 250

22   promissory notes with investors.  With each note, defendant falsely

23   claimed that 1inMM Capital would use the invested funds to buy

24   distribution rights for the film(s) specified in the note, and then

25   repay the note using the profits from licensing the specified film(s)

26

27       ───────────────

28       [1] Unless stated otherwise, all facts recited herein are based on
paragraphs 16 through 28 of the PSR (Dkt. 48) and paragraph 10 of the
plea agreement (Dkt. 45).

to HBO or Netflix.  (PSR ¶ 20, at 6).  Each note guaranteed a specified payment on a specified maturity date, typically six or twelve months in the future.  The notes also listed the principal amount of money borrowed, ranging from approximately $35,000 to $1.5 million, as well as the promise to repay a specified amount at maturity, a calculated return that ranged from 25 to 45 percent.  (Id. ¶ 19, at 5-6).  Additionally, each note contained an assignment of rights provision that listed the specific film(s) that would serve as collateral for the note and expressly warrantied that 1inMM Capital was the sole and exclusive owner of the rights to the film(s).  (Id. ¶ 21, at 6).

However, as defendant knew, his representations concerning 1inMM Capital's business activities and the promissory notes themselves were fraudulent because 1inMM Capital generally did not and would not acquire or possess the distribution rights for the films specified in the promissory notes, and 1inMM Capital did not and would not enter into any distribution agreements with HBO or Netflix for the specified films.  (Id.).  However, defendant's lies did not stop there.

To give investors a false sense of security, defendant also furnished them with fictitious film license agreements between 1inMM Capital and sales agents for the production companies, as well as fake distribution agreements between 1inMM Capital and streaming platforms, all of which contained forged or fictitious signatures. But as defendant knew, these documents were cut from whole cloth; 1inMM Capital had not acquired the film licensing rights for these films and had not entered into any distribution agreements with HBO or Netflix.  (Id. ¶¶ 22-23, at 6).

When 1inMM Capital began to default on notes in 2019, defendant doubled down on his lies. He pacified investors by falsely claiming that any missed payments were caused by the streaming platforms, and that payment on the notes would resume. To support these false claims, defendant sent investors spoofed emails and text messages concerning the delays in payment, which defendant claimed had been sent to him by representatives of HBO and Netflix. But as defendant knew, he had not been in communication with these companies and the correspondence he was supposedly forwarding was again fabricated using the misappropriated identities of employees of HBO and Netflix. (PSR ¶ 24, at 6-7).

Throughout the fraudulent scheme, defendant sold hundreds of promissory notes issued by 1inMM Capital and thereby fraudulently obtained at least $650 million from at least five major groups of private investors. These investor groups in turn comprised more than 250 individual sub-investors. Although the sub-investors did not enter into direct contracts with 1inMM Capital, defendant understood that the investor groups derived their investments, in part, from these sub-investors. (Id. ¶ 25, at 7).

Defendant failed to use the invested money as promised but instead diverted the funds to make payments to prior investors, maintain 1inMM Capital's facade of legitimate operations, make disbursements to himself and entities he controlled, and otherwise finance his own lavish lifestyle. (Id. ¶ 26, at 7). For example, bank records show that defendant was spending millions of dollars for the benefit of himself and his family, including but not limited to:

- The purchase of defendant's $5.7 million residence.
- American Express credit card payments totaling $6.9 million.

- Wires to TD Ameritrade totaling $2.25 million.
- Interior decorating expenses totaling $706,703.[2]
- Payments to Mercedes Benz and Audi totaling $604,990.
- Payments to private jet and yacht rentals totaling $345,477.
- Payments to party planning consultants totaling $174,396.
- Payments to casinos and nightclubs totaling $136,049.

(See Hasson-Owens Decl. ¶ 5).

However, beginning in or about December 2019, 1inMM Capital began defaulting on all of its outstanding promissory notes. Thus, to date, defendant, through 1inMM Capital, is in default to investors on a total outstanding principal amount of approximately $230.36 million. (PSR ¶ 28, at 7).

**III. GUIDELINES CALCULATION**

The USPO calculated a total offense level of 36 based on the following calculation:

| | | |
|---|---|---|
| Base Offense Level: | 7 | USSG § 2B1.1(a)(1) |
| Specific Offense Characteristics: | | |
| Loss of more than $150 million but not more than $250 million | +26 | USSG § 2B1.1(b)(1)(N) |
| Substantial Financial Hardship to 5 or more Victims | +4 | USSG § 2B1.1(b)(2)(B) |
| Sophisticated Means | +2 | USSG § 2B1.1(b)(2)(10)(C) |
| Acceptance of Responsibility | -3 | USSG § 3E1.1 |
| Total Offense Level: | 36 | |

---

[2] Payments were made to Lonni Paul, a celebrity interior decorator. See http://lonnipaul.com/.

(PSR ¶¶ 45-59, at 10-11).

Based upon a total offense level of 36 and a criminal history category I, the USPO calculated a guideline imprisonment range of 188 to 235 months.  (PSR ¶ 143, at 22).

Under the plea agreement, the parties stipulated to the foregoing sentencing factors, including that defendant caused substantial financial hardship to five or more victims under USSG § 2B1.1(b)(2)(B).  (Dkt. 45, at 13).  However, the government expressly reserved "the right to argue that defendant's offense and relevant conduct resulted in substantial financial hardship to 25 or more victims."  (Id.).  Therefore, as first articulated in the government's Objection to the PSR (Dkt. 49), the government objects to paragraph 49 of the PSR because the evidence shows that defendant's scheme caused substantial financial hardship to 25 or more victims, which warrants a six-level enhancement under USSG § 2B1.1(b)(2)(C).  Applying this enhancement would increase defendant's total offense level by another two levels, yielding a guideline range of **235 to 240 months' imprisonment**.[3]

A.    **Substantial Financial Hardship to 25 or More Victims**

Application Note 4(F) to section 2B1.1 instructs that, in determining whether the offense resulted in substantial financial hardship to victims, the Court shall consider a non-exhaustive list of factors, including whether the offense resulted in the victim becoming insolvent, filing for bankruptcy, incurring substantial loss of retirement, educational, or other savings or investment fund, making substantial changes to employment (such as postponing

--------

[3] Absent the statutory maximum of twenty years' imprisonment, defendant's guideline range would be 235 to 293 months' imprisonment.

6

retirement), changing living arrangements, and/or suffering harm to their ability to obtain credit.

The government has separately filed under seal numerous victim impact statements and interview reports documenting the severe, life-changing consequences of defendant's scheme.  (See Dkt. 53; 57, Exhs. 1-20).[4]  As these statements illustrate, defendant's fraud has devastated the lives of his victims by wiping out a lifetime (or generations) of savings and placing them in financial ruin.  The financial burden borne by these victims is also manifest in the emotional suffering they have experienced, including feelings of shame, stress, depression, suicide, loss of dignity, and loss of faith in humanity.  Moreover, defendant's victims were not just wealthy or institutional investors, but also middle-class citizens, often elderly and retirees.  A sample of passages from victim impact statements is set forth below.

- I lost $1.4 million dollars in the [sic] ZACHARY JOSEPH HORWITZ's Ponzi Scheme. That was much of my available cash that I needed for retirement. I am 64 years old. Now, I have had to return to work to afford food and shelter. I will never be able to earn that amount of money back by working. Part of that money was an inheritance from my mother's passing. I am emotionally distraught. I cry every day and have stopped seeing friends or family because of the shame of this financial loss and have a now severe distrust of other human beings. If it was not for my spiritual beliefs, I would have committed suicide.  (Exh. 15).

- I worked for over 40 years, often 60-80 hours a week, with the goal of retirement and being able to enjoy my marriage, time with my adult children and grandchild, my elderly parents, and friends.... I retired as I had long planned in 2020. What should have been a joyous time in my life turned out to be just the opposite when I learned in April 2021 that I had been the victim of Mr. Horwitz's long-running scam. All my post-retirement plans were shockingly completely off the table.  Since April, I have spent many sleepless nights worrying about money and what I will do. I have had to return

---

[4] Unless stated otherwise, all exhibit citations hereinafter refer to the exhibits submitted at docket number 57.

to work and know that I will need to continue working for another 5 years or more. (Exh. 8).

- I'm a cancer survivor and had spent fifteen years building a small business that would allow me to work from home while raising my kids. Upon the strong recommendation of one of my husband's best friends, [] I took out a loan on that business to invest in these deals that we now know are fraudulent.... We have not seen a penny paid back from defendant, who, from what I gathered from the press and public documents, spent in one month what it took me fifteen years of honest work to accumulate and borrow against. I started my business with an inheritance that took my father sixty years of hard work to accumulate. Gone in a flash on defendant's cars, jets and watches. (Exh. 9).

- I'm a seventy-three year old widow. My husband died four years ago from the effects from Agent Orange in Vietnam. We both worked very hard in our lifetimes to raise our two children and live an honest and decent life. I am the mother of a 46 year old special needs daughter.... The devastation that has resulted from Mr. Horowitz can not be quantified.... He robbed me of one third of my retirement account. He robbed me of the confidence to trust anyone with my investments. I realize I will never be able to earn what has been taken from me and my daughter but the emotional damage that is even greater. (Exh. 19).

- I want to provide background on how being victimized by Zack Horowitz of over $750,000 has impacted my life.  The money that I invested through JJMT Capital consisted of funds from my 3 children, inheritance, and hard work that I have earned over a 40 year period of my life.... Currently I have two kids in college, and due to the financial constraints caused by this Ponzi scheme, my family if [sic] now living pay check to pay check and at times finding great difficulty to cover all of our expenses.... His actions have added about 10 more years of work prior to me being able to retire and have a modest lifestyle. (Exh. 6).

- I am currently 52 years old and have 2 6 year old boys. I have been actively working and growing my business for the last 28 years of my life. I have amassed several million dollars over the course of that time in which the majority of my net worth was invested in this Ponzi Scheme.... I have since been forced to file bankruptcy and have my financial world and personal world turned upside down.... I am surviving on food stamps, family loans, unemployment and any work I can find while I battle the combination of all my money being stolen and my other business being shut down from Covid. I have NOTHING! (Exh. 5).

8

Many more victims suffered similar financial harm, including the loss of substantial savings, needing to move to a more affordable residence, or delaying retirement plans.  Below is a table summarizing the number of victims, the types of hardship they have suffered, and the supporting exhibits filed separately under seal.

| Exhibits | Type of Substantial Hardship | # of Victims |
|---|---|---|
| 1a, 1b, 1c, 1d, 1e | Loss of savings; changed living arrangements; changed retirement plan | 16 |
| 2a, 2b, 2c | Loss of savings; changed living arrangements | 2 |
| 3 | Loss of savings; changed retirement plan | 1 |
| 4 | Loss of savings; changed retirement plan | 2 |
| 5 | Loss of savings; bankruptcy | 1 |
| 6 | Loss of savings; changed retirement plan | 1 |
| 7 | Loss of savings | 1 |
| 8 | Loss of savings; changed retirement plan | 1 |
| 9 | Loss of savings | 1 |
| 10 | Loss of savings | 1 |
| 11 | Loss of savings | 1 |
| 12 | Loss of savings | 1 |
| 13 | Loss of savings | 4 |
| 14 | Loss of savings | 2 |
| 15 | Loss of savings; changed retirement plan | 1 |
| 16 | Loss of savings | 1 |
| 17 | Loss of savings | 2 |
| 18 | Loss of savings | 1 |
| 19 | Loss of savings | 1 |
| 20 | Loss of savings; changed retirement plan | 1 |
| | **TOTAL** | **42** |

As demonstrated above, the record is more than sufficient to establish that defendant's crimes inflicted substantial hardship on at least 25 victims.  Indeed, based on the statements of several principal investors, who explained that many of their sub-investors also lost their savings (see, e.g., Exhs. 1, 3), the Court may reasonably infer that the number of victims who have suffered substantial hardship is well above 42.  Either way, there is ample evidence for the Court to conclude that a six-level enhancement under

9

1    USSG § 2B1.1(b)(2)(C) is warranted.  See, e.g., United States v.

2    George, 949 F.3d 1181, 1186 (9th Cir. 2020) (concluding that district

3    court may make a reasonable estimate and infer a pattern based on

4    available information, and need not identify 25 victims by name).

5        Accordingly, the government respectfully submits that

6    defendant's total offense level should be 38, which corresponds to a

7    guideline range of 235 to 240 months.

8        **B.    Restitution**

9        Consistent with the PSR, the parties stipulated in the plea

10   agreement that restitution is mandatory in this case pursuant to 18

11   U.S.C. § 3663A and that the Court may order restitution to any victim

12   of the offense and relevant conduct.  (Dkt. 45 ¶ 6; PSR ¶ 153, at

13   23).  The government concurs with the USPO's calculation that

14   restitution should be ordered in the amount of $230,361,884 to the

15   investor groups identified in the PSR.  (PSR ¶ 153, at 23).  The

16   restitution figure is supported by the factual basis of the plea

17   agreement, in which the parties stipulated that "beginning in or

18   about December 2019, 1inMM Capital began defaulting on all of its

19   outstanding promissory notes," and therefore "defendant, through

20   1inMM Capital, is in default to investors on a total outstanding

21   principal amount of approximately $230.36 million ...."  (Dkt. 45 at

22   12).  Thus, the restitution figure reflects the actual loss of unpaid

23   principal owed to the investors.

24       To the extent defendant argues that restitution should be offset

25   by investors' historical gains, that proposition fails for several

26   reasons.  As an initial matter, 18 U.S.C. § 3663A(b)(1)(B) provides,

27   in pertinent part, that the order of restitution shall require the

28   defendant to "pay an amount equal to ... the value of the property on

                                   10

1    the date of the damage, loss, or destruction ... less [] the value

2    ... of any part of the property that is returned."  Nothing in

3    section 3663A authorizes the Court to discount restitution based on

4    earlier profits preceding the instant loss.  Here, it is undisputed

5    that defendant's scheme caused the loss of $230,361,884 in invested

6    principal, none of which has been repaid to the victims to date.

7    Accordingly, there is no basis to reduce the restitution figure.

8         Nor is there any logical connection between the investors'

9    historical gains and the instant restitution figure.  Unlike some

10   Ponzi schemes in which an investor's past (fictitious) gains are

11   "rolled over" into new investments on paper, here the investors

12   received actual repayments on promissory notes in the earlier part of

13   the scheme and were given the option to affirmatively deploy capital

14   anew into subsequent promissory notes.  Because the investors wired

15   new funds to defendant in connection with each successive promissory

16   note, the outstanding principal of $230 million reflects real money

17   actually deposited by victims, not imaginary numbers on a ledger.

18        Offsetting restitution by an investor's prior gains in the Ponzi

19   scheme also defies basic principles of fairness, which are embodied

20   in the Guidelines and spelled out in case law.  In the context of

21   calculating loss, Application Note 3(F)(iv) states:

22            In a case involving a fraudulent investment
              scheme, such as a Ponzi scheme, loss shall not be
23            reduced by the money or the value of the property
              transferred to any individual investor in the
24            scheme in excess of that investor's principal
              investment (i.e., the gain to an individual
25            investor in the scheme shall not be used to
              offset the loss to another individual investor in
26            the scheme).

27   USSG § 2B1.1, comment. (n.3(F)(iv)).  The Sentencing Commission's

28   rationale behind the application note is instructive: "[T]he gain to

11

any individual investor in the scheme [should not be] used to offset

the loss to other individual investors because any gain realized by

an individual investor is designed to lure others into the fraudulent

scheme."  USSG Supplement to Appendix C, amend. 617 at p. 185 (Nov.

1, 2001).

In United States v. Alfonso, 479 F.3d 570 (8th Cir. 2007), the

Eighth Circuit explains why the same rationale militates against

allowing a defendant to use a victim's gains on an earlier investment

to offset losses on the same victim's later investments:

> [P]onzi scheme operators do not provide investors
> with gains out of the goodness of their hearts or
> to lessen damage to investors, but to keep their
> fraudulent scheme running... Accordingly, they
> should not reap sentencing benefits for making
> payments to investors that are designed to
> perpetuate their scheme.

> The considerations that underlie the application
> note's prohibition against offsetting one
> investor's losses by another investor's gains
> also counsel against allowing a defendant to use
> a victim's gains on an earlier investment to
> offset losses on that same victim's later
> investment. Just as gains realized by an
> individual investor lure other investors into the
> scheme, those gains may also entice that same
> investor to make further contributions to the
> fraudulent enterprise.  A repeat investor is
> essentially in the same position as a new
> investor for these purposes.  To hold otherwise
> would be to reward defendants for conduct that
> perpetuates, and constitutes a component of, the
> Ponzi scheme.

Id. at 572-73.  Other circuits agree that where a victim decides to

reinvest earlier gains to make new investments in the scheme, those

earlier gains cannot be used to offset eventual losses.  See, e.g.,

United States v. Hsu, 669 F.3d 112, 121 (2d Cir. 2012) ("[W]hen the

victims are given the option of withdrawing the proceeds, and when

the perpetrator induces them not to do so, but instead to reinvest

1  the money and again put it at risk, the victims have suffered further

2  loss."); United States v. Setser, 568 F.3d 482, 497 (5th Cir. 2009)

3  (concluding that the district court's method of loss calculation was

4  correct because the defendant "was given credit for money that was

5  returned to investors, but such credits were offset when the money

6  was reinvested into the scheme" because the court "treated the

7  reinvested money as new losses").

8  These decisions take a realistic view of the "natural and indeed

9  desired reactions that investors will have to Ponzi schemes as they

10  unfold." Hsu, 669 F.3d at 121.  As the Second Circuit recognized,

11  "[r]einvested historical gains -- which ... were 'part of a malicious

12  effort to maintain [investors'] confidence and lure other victims' --

13  have become part of the investors' expected gains and wealth,

14  altering their decision-making, encouraging trust in the scheme, and

15  thus inviting the infusions of capital that any Ponzi scheme needs to

16  survive."  Id.  Similarly here, when investors in defendant's scheme

17  began realizing gains in the earlier phase, this not only gave them

18  the confidence to invest larger amounts of capital in the scheme, but

19  also naturally impacted how they ordered their finances, including

20  their residence, spending, and retirement plan.  Consequently, the

21  fallout from defendant's fraud has been so destructive precisely

22  because ephemeral gains lured the victims to invest more and more

23  capital.  Defendant should not be allowed to use those gains as a

24  basis to minimize his responsibility for the economic harm he has

25  caused.

26  //

27  //

28  //

1    **IV.   THE GOVERNMENT'S SENTENCING RECOMMENDATION**

2         Pursuant to the sentencing factors set forth in 18 U.S.C.

3    § 3553(a), the government recommends that defendant be sentenced to

4    240 months in prison, three years of supervised release, and a $100

5    special assessment, and a restitution order of $230,361,884.  That

6    roughly translates to a sentence of one month in prison for every

7    $950,000 stolen from the victims of his Ponzi scheme.

8         **A.   The Nature and Circumstances of the Offense, the**
              **Seriousness of the Offense, and the Need to Provide Just**
9             **Punishment All Support a 240-Month Sentence**

10        It is difficult to conceive a white-collar crime more egregious

11   than defendant's.  He operated a years-long, sophisticated, $650-

12   million Ponzi scheme that caused actual losses of nearly a quarter of

13   a billion dollars.  He faked license agreements, forged signatures,

14   and spoofed emails from real people without remorse.  As his scheme

15   collapsed, rather than show some sympathy for his victims by coming

16   clean, he strung them along for more than a year with new lies and

17   counterfeit documents, pointing the blame at anyone but himself.  His

18   was not a vain attempt to keep a flailing business afloat; 1inMM

19   Capital was a scam from the very start.  Defendant never had any

20   meaningful relationship with Netflix or HBO.  By contrast, even

21   Charles Ponzi's business actually bought some International Reply

22   Coupons early on.[5]

23

24        [5] Indeed, defendant's fraud was eerily similar to Charles
     Ponzi's eponymous scheme: where Ponzi promised investors that he
25   would use their money to purchase International Reply Coupons abroad
     for redemption at a premium in the United States, defendant claimed
26   he would use investor funds to purchase foreign film distribution
     rights, which he could sell to HBO and Netflix for a profit.  See,
27   e.g., Stephen Labaton, "Charles Ponzi: A Pyramid of Postage," N.Y.
     Times (Dec. 7, 1986), available at
28   https://www.nytimes.com/1986/12/07/business/archives-of-business-a-
     rogues-gallery-charles-ponzi-a-pyramid-of-postage.html

1    But defendant did not simply lie to investors to get their
2    money.  He began by betraying the trust of his own friends, people
3    who lowered their guard because they could not possibly imagine that
4    someone they had known for years would unflinchingly swindle them and
5    their families out of their life savings.  (Exh. 1(a)); cf. Christine
6    Hurt, "Evil Has A New Name (and A New Narrative): Bernard Madoff,"
7    2009 Mich. State L. Rev. 947, 976 (2009) ("[M]any Ponzi schemes can
8    be described as affinity frauds, because community ties and the
9    victim's familiarity with other investors decrease skepticism of the
10   otherwise too-good-to-be-true promises of financial reward.").
11   Defendant not only victimized these people in their own right, but he
12   used them and other early investors as props in his intricate
13   illusion to lure ever more victims to his scheme.  (See, e.g., Exhs.
14   1(e), 2(c)).

15   The tragic consequences of defendant's vicious dishonesty are
16   immense.  While it may be tempting to reduce the damage defendant
17   caused down to dollars and cents, the reality is that his victims
18   have suffered an emotional cost as heavy as the financial cost.
19   Defendant's callousness shattered reputations and broke
20   relationships.  Though the Court can order restitution, the odds are
21   close to zero that defendant will ever repay more than a small
22   portion of the more than $230 million in losses he caused, let alone
23   remedy the lasting emotional harm he has inflicted.  See United
24   States v. Rangel, 697 F.3d 795, 803-804 (9th Cir. 2012) (while
25   defendant's inability to pay is not an aggravating factor, district
26   court could note such factor in "focus[ing] instead on the impact on
27   the victims").

28

One victim, who had hoped to retire in 2020 only to have defendant steal the money he had been saving for forty years, hits the nail on the head in describing defendant's heartlessness: "Zachary Horwitz did not 'make a mistake.'  His deceptive actions were **well-planned and premeditated** over a number of years.  He stopped stealing from others only because he was caught.  Without the maximum prison time, Zachary Horwitz will continue to invent devious schemes and devastate the lives of countless others."  (Exh. 8).

This victim is not alone.  Letters from others are consistent in describing the harrowing financial and emotional hardship defendant has inflicted, their feelings of being personally violated, and how only a maximum sentence fits the true gravity of the crime.  One reports having his "financial world and personal world turned upside down," with defendant's fraud leaving him bankrupt and forming the focus of his ongoing divorce.  (Exh. 5).  He writes, "I implore you to keep this sick[] human being away from society as long as possible" so that no more investors like him can be "victimized and slaughtered."  (Id.).  Another victim, who has supported himself since the age of 17, writes how he gets "extremely sick to my stomach" envisioning his life's savings being spent on defendant's "private jet travel, home, and Lakers courtside tickets," and begs the Court to "maximize[] all of the penalties available for the crime committed.  (Exh. 6).  Yet another victim aptly describes defendant as "a serial criminal" without remorse, who "stole indiscriminately and saw himself as entitled and superior; he is a thief with no sense of morality or humanity."  (Exh. 12).  He implores the Court to remember defendant's victims and to "sentence him to the most severe punishment within your abilities."  (Id.).  A mother and cancer

1    survivor explains how, "[b]ecause of the defendant's continued lies,
2    we were unable to get any relief during the pandemic and spent a year
3    in fear struggling to pay basic bills, borrowing from friends to get
4    by.  I have since gone on antidepressants to cope, but still
5    struggle."  (Exh. 9).  She describes how "the effects of defendant's
6    actions will be felt by the victims for at least twenty years."
7    (Id.).  It is only fitting defendant face a commensurate punishment
8    of 240 months in prison.

9         Defendant caused catastrophic and likely irreparable harm to
10   myriad victims.  He did so intentionally, callously, and for his own
11   enrichment.  Even as his fraud collapsed, he continued to dissemble
12   rather than accept responsibility or exhibit remorse.  Only now,
13   after being arrested and facing considerable prison time, has
14   defendant admitted what he has done.  While the PSR states that
15   defendant "feels deep remorse for the people he hurt and the price
16   those he loves will pay while he is incarcerated" (PSR ¶ 89, at 15),
17   nothing appears to support this assertion beyond defendant's own
18   word.[6]  By now it should be clear what that is worth.

19        **B.    Guideline Sentence of 240 Months Is Necessary to Afford**
                 **Adequate Deterrence**
20

21        The need for general deterrence is at its zenith in this case.
22   For the better part of the last decade, defendant and his family
23   built a life of luxury on the backs of his victims.  Defendant bought
24   his lavish Beverlywood home for $5.7 million.  (PSR ¶ 132, at 20).
25   As recounted in the criminal complaint, the interior of defendant's
26
27
           [6] Defendant could best demonstrate his contrition by assisting
28   the government in tracing any recoverable assets for victims.  To
     date, he has not done so.

residence exhibited similar extravagance: an extensive home theater, a home gym, a grand piano, and a wine cellar, among other things. (Dkt. 1, ¶ 18, at 17).  Perhaps it should come as no surprise then that his bank records show he paid over $700,000 to an interior designer.  (Hasson-Owens Decl. ¶ 5(b)).

Defendant's bank records reveal further evidence of defendant's opulent lifestyle beginning in 2016: $345,477 spent on private jet and yacht charter companies, (id. ¶ 5(e)); $136,049 spent at well-known Las Vegas casinos and nightclubs, (id. ¶ 5(f)); over $600,000 on vehicle payments, (id. ¶ 5(h)); and nearly $7 million spent paying off credit card bills at American Express, (id. ¶ 5(c)).  Defendant even spent $174,396 over a two-month span in 2018 on a "party consultant."  (Id. ¶ 5(g)).

The sad reality is that many would gladly risk the possibility of conviction in exchange for several years of such a lifestyle.  For such people, only the likely prospect of a significant term of imprisonment can deter them.  Fortunately, economic crimes like defendant's are quintessentially deterrable so long as they are met with a significant term of imprisonment.  In drafting § 3553, Congress specifically confirmed that "[t]o deter others from committing the offense ... is particularly important in the area of white collar crime."  S. Rep. No. 98-255, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259.  Congress was particularly concerned with the fact that "[m]ajor white collar criminals often are sentenced to ... little or no imprisonment," which the offenders disregard as "a cost of doing business."  Id.  A guideline sentence is necessary to ensure those costs for the next would-be Ponzi schemer outweigh the potential benefits.

The profile of white-collar criminals like defendant also demonstrates the increased value of general deterrence.  "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'"  United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)).  Further, given the challenges in uncovering fraud offenses and distinguishing them from merely unsuccessful business ventures, the need for general deterrence in white-collar cases is all the starker.

Sentences recently imposed by federal courts nationwide, and across a range of large Ponzi schemes, confirm that a sentence of 240 months' imprisonment fits the crime in this case.  See United States v. Houchins, No. 20-CR-245, ECF 59 (E.D.N.C.) (120-month sentence in a $1.7 million[7] Ponzi scheme); United States v. Davis, No. 18-CR-25, ECF 164 (N.D. Ill.) (160-month sentence in $7.1 million Ponzi scheme); United States v. Stewart, No. 14-CR-14, ECF 241 (C.D. Cal.) (168-month sentence in $9 million Ponzi scheme); United States v. Koerber, No. 17-CR-37, ECF 638 (D. Utah) (170-month sentence in $45 million Ponzi scheme); United States v. Slade, No. 9-1492, ECF 1551; 13-CR-460, ECF 55 (D. Ariz.) (180-month sentence in $35 million Ponzi scheme); United States v. Santillo, Jr., No. 19-CR-6135, ECF 58 (W.D.N.Y.) (210-month sentence for $102 million Ponzi scheme); United States v. Carpoff, No. 20-CR-17, ECF 53 (E.D. Cal.) (360-month sentence in $790 million Ponzi scheme).

---

[7] The figures in each parenthetical refer to the approximate restitution ordered in the case, reflecting actual losses to victims.

19

1
2

     **C.    Defendant's Personal Background Provides No Basis for a Downward Departure or Variance**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

While the childhood defendant described to Probation was not idyllic in its entirety, he grew up in a middle-class family and received strong support, eventually graduating from the University of Indiana.[8]  Even accepting at face value defendant's characterization of his own childhood, whatever challenges he faced were typical of millions of law-abiding Americans.  It certainly is unremarkable in comparison to the horrific upbringings many of the criminal defendants in this district experience that far more predictably lead to a life of crime.  And, regardless of how one evaluates defendant's background, "Lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted."  USSG § 5H1.12.  Nothing in defendant's background suggests he had no alternatives in life or failed to grasp the gravity of his crimes.  On the contrary, defendant's college education and the sophisticated nature of his fraud suggest he could have taken many paths other than the one he chose.  Thus, while defendant's solid upbringing is not necessarily an aggravating factor, neither should it be mistaken as mitigating.

21
22
23
24

Defendant's willingness to discuss some topics with Probation and not others also suggests he may not be so remorseful as he lets on.  Notably, defendant was happy to speak freely (and self-servingly) to Probation about a one-year Americorps job he took right

25

26
27
28

     [8] Defendant's stepfather, who is described euphemistically as "well-off" in the PSR, "offered Horwitz and his mother financial stability" and significantly improved their well-being.  (PSR ¶ 82, at 14).  In fact, defendant's present bond is secured by a property held by his mother's trust with a reported fair market value of $2.2 million.

out of college and his stint as a dogwalker.  But when given the
opportunity to discuss the business ventures he managed while
orchestrating his scheme -- and how they might have benefited
financially from his criminal enterprise -- he declined to comment.
(PSR ¶¶ 117-120, at 17-18).  And of course, when it comes to
defendant's background, no job played so prominent a role in
defendant's life as his career as a fraudster.  Defendant did not
merely make a series of bad decisions.  His Ponzi scheme was not an
aberration from an otherwise law-abiding existence.  The lie, which
he sustained for years, was the core of his identity.  He was a
professional criminal; and, unfortunately for his victims, he was
very good at his job.

**V.   CONCLUSION**

The human cost of defendant's crimes is incalculable, but the
Court can still fashion a sentence that both accounts for the evil he
has done and will deter him and others like him from engaging in
similar conduct again.  The government therefore requests that the
Court impose a guideline sentence of 240 months' imprisonment, three
years of supervised release, and a $100 special assessment, and a
restitution order of $230,361,884.

## DECLARATION OF PATRICIA HASSON-OWENS

I, Patricia Hasson-Owens, declare as follows:

1.    I am a Forensic Accountant with the Federal Bureau of Investigation.  I have knowledge of the facts set forth herein and could and would testify to those facts fully and truthfully if called and sworn as a witness.

2.    Based on my review of the FBI case file, I am aware that, as part of the investigation in United States v. Horwitz, 21-CR-214-MCS, federal agents obtained bank records from City National Bank for bank accounts held in the name of (1) Zachary Horwitz (account number ending in 5270) for the approximate time period of January 2016 to March 2021; and (2) 1inMM Capital LLC (account number ending in 0290) for the approximate time period of January 2016 to March 2021.

3.    According to bank records for the two accounts described above (the "Horwitz bank accounts"), defendant Zachary Horwitz was the sole signatory on each account.

4.    The information contained in the statements from the Horwitz bank accounts was uploaded, as well as entered manually, into Microsoft Excel spreadsheets summarizing the bank transactions.  I, together with other FBI employees, reviewed these spreadsheets for accuracy.  I have provided a copy of these draft spreadsheets to the Assistant United States Attorneys assigned to this case.

5.    By examining the bank records for the Horwitz bank accounts, I identified several debits from the accounts between 2016 and 2021, as described below:

a.    Two wires to Escrow of the West (Beverly Hills), in January 2018 and March 2018, respectively, totaling approximately **$5,727,776.**

1          b.    Seven wires to Lonni Partridge-Paul and one wire to

2   Lonni Paul Design between March 2018 and February 2019 totaling

3   approximately **$706,703.**

4          c.    Approximately 191 electronic payments to American

5   Express totaling approximately **$6,928,984.**

6          d.    Two wires to TD Ameritrade Clearing Inc., in January

7   2017 and January 2018, respectively, totaling approximately

8   **$2,250,000.**

9          e.    Multiple payments to Jetsmarter Inc., Tropicalboat

10   Charters Inc., and Jetsuite Air, totaling approximately **$345,477.**

11          f.    Multiple payments to Aria Resort & Casino, Mirage,

12   Bellagio, Venetian, MGM Grand, Vdara, and MB Light Nightclub,

13   totaling approximately **$136,049.**

14          g.    Two payments to Mindy Weiss Party Consultants in

15   October 2018 and November 2018, respectively, totaling approximately

16   **$174,396.**

17          h.    Multiple payments to MBFS, Mercedes, Mercedes Benz of

18   Beverly Hills, and/or Audi Financial totaling approximately **$604,990.**

19   Public sources indicate MBFS is Mercedes Benz Financial Services.

20       I declare under penalty of perjury under the laws of the United

21   States of America that the foregoing is true and correct and that

22   this declaration is executed at Los Angeles, California, on January

23   26, 2022.

24

25                                     PATRICIA HASSON-OWENS

26                                     Forensic Accountant

                                     Federal Bureau of Investigation

27

28